May it please the Court, Lawrence Rolfing, on behalf of the Appellant and Plaintiff, Brent Boyd. This is an ERISA case. It involves the abuse of discretion standard of review. The NFL pension plan is clearly entitled to discretion to make determinations. The question in this case is whether the NFL plan abused its discretion. Counsel, can you tell me where in the record I can find an express statement by a physician that there is specific medical evidence of a proximate cause of disability? Your Honor, on excerpt page 149, this is the form filled out by Branko Radlovich, who is the examining psychiatrist selected by the NFL plan. Paragraph 12, the last sentence, is, is it an illness or injury resulting from a football-related activity? And the box or the mark is yes. It is the injuries and impairments identified by Dr. Radlovich, which is emotional lability, depression due to post-traumatic organic brain disorder. He said, yes, this is a football-related injury. The other opinion that is. At the time of the claimed injury, there was no major medical treatment of any kind, right? In 1980, the preseason game against the Miami Dolphins, that is true. He did not, he was not hospitalized. He did not have a sub-zero hematoma. There were no examinations, there were no MRIs, there was no physical examination, nothing. He had a couple of trainers out in the field, said, gee, you got shooken up and shaken up, and we're going to take you out of the game for a while. Right? That's basically correct, yes. So what medical evidence then comes to light that over time you can attribute the medical condition specifically to the head injury at that preseason game or preseason activity? The brain spec examination that was conducted by Dr. Amin, he says, documents the presence of brain tissue damage that, according to the information available to Dr. Amin, according to the information available to Dr. Ford, and available to Dr. Radovich, is a result of that specific trauma in August of 1990. The doctors are operating on a hypothesis that there was approximate cause of the injury. They don't, they can't medically prove it. This is. They're relying on some third party to say something, to say that has not been necessarily cross-examined, nor can be demonstrated by clinical methods. They're relying to that extent on the truthfulness of Brent Boyd when he says, I haven't had any other concussions. True statement, Your Honor. That is a true statement. But we rely on expert witnesses, and expert witnesses are entitled to express opinions, and the validity of an expert witness's opinion is dependent upon the foundation of the facts that they assume. That's the problem I'm having, because most of the foundation is hypothetical. Well, we know that he had the, his bell run. We know the result, but we don't know the cause by clinical methods. Well, Your Honor, the best evidence that the NFL plan has for the proposition that playing football did not cause Brent Boyd mental problems is the opinion of Dr. Gordon. And Dr. Gordon says that trauma in 1990 didn't cause at all or a major part of his current problems. But Dr. Gordon specifically left open the proposition that it's less than 50 percent. He didn't rule it out as a cause of Mr. Boyd's disability. All of the doctors agree. There's a total lack of establishment of approximate cause. That's the problem I have with the case. But this is my problem. It's in reading Dr. Gordon's letter that, let me get this straight. So the NFL ERISA administrator relied on Dr. Gordon's letter to deny the claim. Yes. Okay. So Dr. Gordon, in paragraph one, well, I don't know what paragraph it is. He recites all these symptoms and problems that Brent Boyd is suffering. And there's a whole history of doctors saying that because of his head injury while playing football, all these symptoms and things are generated. But now we get to the point of what is his disability payment amount going to be. So he says he has headaches, lack of energy, lack of concentration, forgetfulness, depression, lightheadedness and dizziness. And then he leaves room for the possibility that the alleged head injury of August 1980 could not be organically responsible for all or even a major portion. So this is a question for you, too, because I'm trying to understand this. So that means that it could be responsible for some portion. And he doesn't affirmably say that in this letter, that he leaves room for that. And then he says, to a reasonable degree of medical probability, the depression he's currently experiencing could not be an organic consequence of the head injury of August 1980. So here again, he lists all these symptoms that Boyd is, Boyd is, I'm sure he's a famous person, but I don't follow football that closely, that Boyd is. Lineman get no fame. OK, he's a lineman. OK, that Boyd is having. But he says it's only the depression that's not caused. Again, he's leaving open the room that all these other symptoms were caused by the head injury. But this is all we have that the company denied liability on the basis of, which is, I guess I had the same problem with the case we had earlier, that that maybe Judge Beezer's right that there there's in, you know, in the real world, there really wasn't a proximate cause from that particular head injury to all the stuff. Now, it could be more than that particular injury. I would imagine getting banged up for several years as a Minnesota Vikings lineman, you could be really messed up. But that this this doctor's report doesn't get there all the way. It leaves open these things. So how do we fill the holes? How do we deal with that? Well, the opinions of Dr. Ford and Dr. Rozenick, supported by all of the other treating and examining physicians that have consulted with Mr. Boyd, fill in that gap. Dr. Gordon specifically left open the proposition that the depression that was significantly impairing Brent Boyd and entitling him to to non-football related disability benefits was caused by the pain. And it's conceded that Mr. Boyd had orthopedic injuries and knee injuries and that that those orthopedic injuries in and of themselves did not cause disability. But Dr. Gordon left that open, that pain was the factor that gave rise to the depression that disabled Mr. Boyd. Dr. Ford's opinion is clear. And Dr. Ford prepared his report in May of 2000 and that he didn't fill out his form addressing the issue of causation until June of 2000. And with respect to the issue of other causes other than playing football, it's difficult to prove a negative. It's difficult for me to prove that I've never had another I've never had a head trauma. But it is very easy to prove that I have had a head trauma if it indeed occurred. There would be reports, automobile accident, emergency room treatment for a concussion, something in his history would have been relevant, would have been discovered. And it wasn't. It's not in here. Mr. Boyd has been to three physicians selected by the NFL pension plan. He has been to he's had multiple treatment treating physicians. He's had other examining physicians that prior counsel retained. And the history is always the same. There's no indication whatsoever that Mr. Boyd's credibility was ever an issue, that the NFL ever doubted Mr. Boyd's credibility in relating a history to Dr. Ford, Dr. Rogelick, or to Dr. Gordon. And so we're at the proposition, the point where the NFL pension plan agrees that Mr. Boyd is in fact disabled and has decided for some reason to to not go back to Dr. Ford or go back to Dr. Rogelick for additional information. Instead, the NFL plan goes to a completely different physician. That's Dr. Gordon. And then takes Dr. Gordon's report, and at the request of counsel, counsel says, on behalf of Mr. Boyd, we would like to have this report reviewed by Dr. Ford and Dr. Rogelick, Dr. Ford in particular, and ask them if it changes their opinion or provides additional foundation for their opinion, and the NFL plan says no. Actually, the plan said yes, counsel for the plan said no, and shut the door. And that really is an abuse of discretion. To tell a participant or a beneficiary of an ERISA plan, you can present any evidence that you want, just not the evidence that you really want, the mutual physician's opinion. They have some medical opinion, and they deliberate and consider it, and they can't arrive at a conclusion on proximate cause, and they deny the claim. Now, there's nothing irresponsible about that, if that's the fact. I mean, that's why there's three people on the panel, to review whatever the claimant can present, whatever the physicians present, and to look at what the plan says, and to make the award or to deny the award. That's what they're there for. Now, as long as they act rationally and reasonably, we're going to affirm it, aren't we? If it's rational and reasonable. But I would submit to your honor that rejecting Dr. Ford's opinion, rejecting Dr. Roglevich's opinion, in light of the opinion of Dr. Gordon, leaving open the probability that Dr. is irresponsible. It's not the way that rational people don't go out and retain a physician, and then just simply say, well, we don't like what you've said. We're going to go to another doctor. That's not what reasonable people do in the conduct of serious affairs. Why would you consult with a physician if you didn't intend to take his advice? Dr. Ford and Dr. Roglevich have been clear. And if you're very sick and you go to a physician, he tells you, you're going to die. You're just no luck. You're not going to go get somebody else and have another advice? Sure, you went to him, but you've got to go as many times as you need to, to try and get some help. But there's no harm in rejecting a physician's position. But when you have both the neurologist, Dr. Ford, and the psychiatrist, Dr. Roglevich, and you don't like their opinions, and you go get a third opinion from Dr. Gordon, and Dr. Gordon doesn't disagree. You're not satisfied, isn't you? You don't like or dislike a doctor's opinion, but you may not be satisfied that you've got enough. And if a party in litigation was revealed that they went to serial experts to try and prove their case, it wouldn't look good. And that's what this is. This is serial experts. And each of the experts has expressed an opinion on causation. So Roglevich was hired by the NFL? Selected by the NFL plan, and paid by Mr. Boyd. Paid? Dr. Ford was in the same paradigm. Selected by the NFL plan, paid by Mr. Boyd. And they said it was caused by the head trauma. Yes. And Gordon doesn't rule it out. That's correct. Why was the cause limited to just, I mean, is it necessarily under the plan terms that the cause could only have been the head trauma? Or was that the cause that you had most provable because it was documented somewhere? It was the cause that was most documented. And as Dr. Ford indicated in expressing his opinions, understanding the nature of football in general, and understanding the nature of working as a lineman in particular, that there would be continuous head trauma of lesser severity. And that this one documented trauma with well-documented sequelae, with minor trauma thereafter, would have put Mr. Boyd in the situation that he now finds himself, which is disabled. And so Dr. Ford didn't rule that out. Interestingly, Dr. Gordon disavows any familiarity with the nature of football, the violent nature of playing professional football, and the violent nature of work as an NFL lineman. It's just brutal work. And Dr. Gordon, I would submit, has an incomplete- This client had a two-step benefit plan for injury. And he did avail himself of the lesser requirement and got that benefit, right? What he's trying to do now is to step up to the total permanent disability. He even adjudicated this total permanent. The question is causation. Yeah. That's the only question you're asking. Whether it's football or not football. That's correct. And was there any evidence of any other injuries that he ever had at work football? There's not a scintilla of evidence that Mr. Boyd had any other head trauma other than playing NFL football. In fact, he graduated from UCLA with honors. Oh, a fellow Bruin. And I still haven't heard of him. What year did he graduate? I'm just kidding. Well, it would have been 1989 or so, or 1990. If I could reserve the balance of my time for rebuttal. Thank you. Good morning. My name's John McAllister. I represent the athletes, the Burt Bell, Pete Rosell NFL player retirement plan. Judge Beezer, you referred to three people. Actually, it's six people on the board. Three are appointed by the Players Union. And three are appointed by the NFL team owners. This is a classic jointly trustee Taft-Hartley pension plan. I also agree with Judge Beezer when you said the question here is, did the board, the six members, act irresponsibly or did they act rationally? We, of course, believe that the record clearly establishes that the board acted rationally when it decided the issue presented to it. And that is whether Brent Boyd's June 2000 application, whether his total and permanent disability in 1999 resulted from an alleged head injury in 1980 at the beginning of his seven-year career in the NFL. The plan agreed that Mr. Boyd became totally and permanently disabled in October of 1999 when he stopped working, but could not find any clear connection or causal link between his total and permanent disability in 1999. Now, by what standard do we measure the conduct of the board in making that determination? The board, under the Firestone case by the Supreme Court, the board is given broad discretion, the broadest discretion possible under ERISA by the plan. That being the case, the board's discretionary decisions, including in this case, are reviewed under the highly deferential, arbitrary and capricious or abusive discretion standard of review. Even if the plan chooses the doctors that do the examinations? The neutral physicians that were referred to before, that is the case, Your Honor. The neutral physicians are... The word neutral means that this is a physician that's agreed upon by both sides on the retirement board. Both the employers' representatives and the employees' representatives. That's correct, Your Honor. But they still represent... I mean, the money's coming out of the plan. It's not necessarily owner money or union money. It's money set aside by contract for this purpose. So, and the plan is administered by the board. And the board, in fact, selects the position and has a financial interest in keeping the plan solid, doesn't it? That's correct, Your Honor. But I think the Ninth Circuit has been clear. And this, in fact, in the Corson case involving this plan, the Third Circuit has been clear that this board, because it has balanced representation, does not operate under any conflict of interest that would cause the district court or this court to apply a less deferential standard of review. Now, as a result of the board's decision in finding that there was no causation proof, the board awarded Mr. Boyd inactive total and permanent disability benefits of about $18,000 a year, as opposed to the higher-paying football degenerative benefits that Mr. Boyd requested, and that would be about $100,000 a year. Now, I think when we look at this case, we need to look at all the applications submitted by Mr. Boyd. In 1997, he applied for football degenerative benefits based on his orthopedic injuries, primarily through his right knee and left ankle. At that time, he said, I know I have the mind and spirit to succeed in an occupation, but my body refuses to cooperate. He also said that as October 1981... Excuse me, but what does that have to do with the Dr. Gordon report upon which the NFL relied in denying his claims for the football degenerative... Well, it doesn't have anything to do directly with Dr. Gordon. Right, so can we just get to my question, because I really would like to hear your answer, too. We have these prior physicians, at least one of which was hired by the NFL, who say that it was his... These are mental injuries now, not orthopedic injuries, but we're talking about his fatigue, his depression, his pain, all of the other ones listed in Dr. Gordon's report. And they say that it was caused by the head injury. And then we get Dr. Gordon's report, and he doesn't rule that out. And he doesn't supply us with any other cause. Well, Your Honor, I respectfully disagree with pretty much everything you've said. Well, tell me why it's wrong. Okay. I know you disagree. I'm not making it as a statement. I'm trying... I see holes in this Gordon report, and I'm asking you to explain why they're not there. I'm not asking you to agree with me. Okay. I'm not necessarily disagreeing with you. I'm just going to tell you how I... Please answer my question, please. I will, Your Honor. Dr. Ford, the board found that the reports by Dr. Ford and Dr. Radicevich were internally inconsistent. Now, they did on the forum check the box and say caused by NFL football activities, but their narrative reports demonstrated real doubt and uncertainty as to causation. Now, in the case of Dr. Ford, Dr. Ford said, the patient's symptoms raised the question of possible organic brain injury. Later on, he says, the patient does appear to have several problems that may arise out of head injuries suffered in the course of his NFL career. And in both those paragraphs, Dr. Ford says, the patient should undergo neurological testing to better define what cognitive deficits he may be suffering. And then later he says, only further testing will be able to determine the extent of those injuries. This is exactly what Dr. Gordon did. Dr. Gordon performed the neuropsychological and cognitive testing that Dr. Ford said should be done. Now, in Dr. Radoslavljevic's case, he was equally unsure. He said that the disability that Mr. Boyd was experiencing appears to be the result of a fairly small brain injury that I cannot fully understand. He also noted that Mr. Boyd was somewhat obese. And in contrast to Mr. Boyd's claimed symptom of loss of memory and forgetfulness, he noted that Mr. Boyd scored 30 out of 30, 100%, on a mini mental state exam which included cognitive functions, and that this exam was a crude test of memory that he did very well on. So the testing results contradicted the reported symptoms from the patient. So in both the case of Dr. Radoslavljevic and Dr. Ford, the board performed its fiduciary duty of carefully analyzing the facts that took into account that they checked the box on a firm form, but then they did what the plaintiff said in this brief they should do. They looked at the whole record. They looked at what the doctor said in their narratives. And it wasn't that they didn't, it wasn't that they disliked the reports of Dr. Ford or Dr. Radoslavljevic. It was that they found them inconclusive because the reports showed doubt and confusion as to causation. And so they said, well, we're going to have to go and find another doctor. And they went to a preeminent expert in cognitive neurology and neuropsychology, Dr. Gordon at John Hopkins in Baltimore, Maryland. And Dr. Gordon found that the alleged head injury of August, 1980 could not be organically responsible for all or even a major portion of the neurologic. Stop right there. When he says it can't be responsible for all or even a major portion, doesn't that mean he's saying it could be responsible for some portion? No, Your Honor. There could be other causes besides the 1980 head injury. He's not saying that it's not responsible for any of it. What's the standard under the policy? The standard under the policy is... Under the policy. Well, I mean, under the plan. Under the plan is that the total infirmity disability has to arise out of or result from league football activities. I mean, does it have to be all of his disabilities? Do they have to be solely from that or 100% from that, from the football activities? Well, the plan doesn't really speak to that issue, but there has to be a... In the 1988 amendments confirmed this reading, you know, the collective bargaining parties and the board agreed that there has to be a clear causal link between the alleged football injury and the total impermanent disability. And I think... He's not saying that... He's saying it's not... There's not a causal link for all or even a major portion of... Why couldn't he say if there's no causal link, if there was no causal link? Well, Your Honor, the way you're reading it is one way to read it. And under the highly deferential standard, there can be more than one reasonable way to read, to interpret facts or to interpret the plan. Now, here he's saying that the alleged head injury in 1980 could not be organically responsible for all or even a major portion of the problems he's experiencing. One way to read it is he's saying it could be responsible for some, but that isn't the way the board read it. The board read it that it's not responsible for all or even a major portion and that there could be other causes. And you mentioned earlier that there were no other causes cited. Well, in fact, at the end of that paragraph 11, and we're reading from excerpts of record... I have it in front of me. 403. He said most, if not all, of the complaints are attributable to four things. First, untreated hypertension. The record reflects that Mr. Boyd had suffered from high blood pressure, major hypertension for quite a while. Physical deconditioning. That's a euphemism for the fact that his doctor... I understand that. He's out of shape. He's overweight. That obviously contributes to the hypertension. I understand what you're talking about there. Also depression and finally pain. And now, getting to the pain, which is an orthopedic problem, you know, there's a point... That was his first complaint. Pardon? That was his first complaint. His first application in March of 1997 was for orthopedic injuries and the resulting pain that can be disabling. Now, as we argued and Judge Napoleon Jones found, Mr. Boyd was barred from bringing orthopedic pain into the equation here because he had applied for total and permanent disability in March 1997. Based on that, the board denied. He did not appeal administratively and he did not take that to court. You know, I think it's important to recognize here that what happened towards the end of this case is that Mr. Boyd's claim became kind of a moving target. March 1997, he says, I'm orthopedically disabled. He was unsuccessful in that claim. So three years later in 2000, he claims that he had a head injury, which he had never reported to anyone previously that caused him to be totally and permanently disabled. And the board had him tested a number of times, as we've discussed, by Drs. Ford, Radoslav Levich, his own consulting physicians, and Dr. Gordon. And the board concluded that the most definitive and most persuasive and complete opinion by Dr. Gordon, in contrast to the equivocal views of other doctors or noncommittal views, showed that there was no causal link that Dr. Gordon could find between the alleged 1980 head injury and his total and permanent disability in 1999. One issue that was raised in the opening argument by the plaintiff is, is credibility an issue? And plaintiff's counsel said, no, I think it is an issue. I think, in fact, Dr. Gordon, on the same page that we're reading from, stated in paragraph eight, that on neurological exam, examples of inconsistent apparent lack of effort. That's an indication that there might have been some lack of full sincerity in undergoing the test by Mr. Boyd. I think Dr. And then the board explains its denial of benefits. It's, I'm looking at ER 472. It talks about Mr. Boyd's alleged head injury. Is there any real dispute that he had the head injury? Well, there, as Judge Beezer said, there is no documentary contemporaneous medical evidence. Right. Are you disputing that he had the head injury? We're not disputing that he reported he had a head injury, and we're accepting that at face value. And then we have that claim evaluated by doctors. And at the time that this occurred, was there any dispute that he actually injured his head? No. The board accepted the claim that he made. I'm not asking about the board. I mean, at the time that he had the injury, does anybody dispute that he had the injury? In 1980? Yes. There's no dispute that he had the injury in 1980? There's no contemporaneous confirmation that he had the injury in 1980? No medical record. Okay. Is that common or uncommon, that you would have a medical record or not while you're playing a professional football game? You know, there are so many injuries in professional football, and I've never been involved in professional sports. I don't know if it's common or not, Your Honor. All right. I do know that teams have trainers and physicians on the field, and they treat players, and they keep records. And they send them right back out. Sometimes they keep records as required by the insurance companies. I'd like to also talk about the question of whether Dr. Gordon's report should have been referred to Dr. Ford for further evaluation. The counsel for the plan told Mr. Boyd's lawyers that that would not be done, and they said that it would be inconsistent with the board's policy and practice. What the board does is, when it receives medical opinions, it takes them in on a sort of a rolling forward basis. Just to use the example of this case, Dr. Ford gave his opinion, and later on, at the end of the process, Dr. Gordon reviewed the opinions of all the prior doctors, Dr. Alters, Dr. Amen, Dr. Spencer, Dr. Ford, Dr. Roslevich. He also was provided with something that none of the other doctors were provided with. That was the records of Mr. Boyd's treating physician, Dr. Brunst, from about the mid-'80s into the 1990s. And the board does not have the practice of, you know, taking a later report and going back to an earlier doctor and getting into a debate between them. And in its brief, the plaintiffs cited a case, the Armstrong case, that purports to be a situation in which the board did do that. And that's not the case. What happened in that case is, the board simply asked a doctor that it had consulted for clarification of his own views, didn't take that doctor's view and sent it back to some earlier doctor. As far as the SPECT exam goes, I think it's important to look at what the doctors said in their reports. As the report below found, Drs. Amen and Spencer did not find that whatever problems Mr. Boyd was suffering were caused by the head injury in 1980. All they said was that they observed some problems that may be consistent with a head injury, but they were unable to create any specific causal link between Mr. Boyd's problems in 2000 and his problems and his alleged head injury in 1980. If the Court has no other further questions, I'm finished. Thank you, Counsel. Thank you. Just a couple of comments. Counsel has submitted that reading Dr. Gordon's report as implying that the head injury in 1980 was responsible for some is countered by the reading that there could be others. That's saying the same thing. Responsible for some and then there could be others is saying the exact same thing. The alternate reading proffered by Counsel is the same reading that Your Honor has submitted as being the right reading, and it is the right reading because they've conceded it. Judge Jones indicated that Mr. Boyd could not bring up his orthopedic injuries, but Counsel is submitting to this Court that as a knee condition deteriorates once you file the football-related injury claim, that it could never be disabling in the future, and that's not the law, and because this plan specifically allows for and envisions disability occurring far outside of the time when the individual stops playing football. And Counsel also submits that Dr. Gordon's. Are you saying that the injury was in the nature of a disease that becomes worse over time, or are you saying that the trauma was all sustained on the field during the practice session? I'm saying that as time would get worse, Your Honor. Well, is there additional trauma involved? Not necessarily. That's what we have. That's why we have degenerative arthritis. We have brain injuries. An arthritic condition is essentially a disease that is progressive. Not traumatic arthritis, Your Honor. Traumatic arthritis is related to a specific trauma. And pain related to a condition. And that also goes to the central question that Counsel has not addressed. Is this a 100 percent causation case, or a 50 percent causation plan, or is this a 20 percent causation plan? All of the medical evidence points to at least some legitimate, significant degree of causation. And to read the record in any other way, I think, is an abuse of discretion by the NFL plan. I would urge the Court to reverse. All right. Thank you, Counsel. This case, Boyd v. the NFL Retirement Plan, is submitted. And we'll take up Faneke v. Prudential Insurance Company. Again, Counsel, it's getting late in the day, so where's the new counsel? I'm Plaintiff's Counsel. Oh, you're Plaintiff's Counsel on this one? All right. So we don't need to take up all the time allotted in this case.
judges: Beezer, Hall, Wardlaw